UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CYNTHIA PAGE,

        Plaintiff,

    -v-                         1:20-CV-732

ANDREW CUOMO, in his official
capacity as Governor of the State
of New York, and HOWARD A.
ZUCKER, in his official capacity
as Commissioner, Department of
Health of the State of New York,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| AMERICAN FREEDOM LAW CENTER | DAVID E. YERUSHALMI, ESQ. |
| Attorneys for Plaintiff | |
| 383 Kingston Avenue, Suite 103 | |
| Brooklyn, NY 11213 | |
| | |
| HON. LETITIA A. JAMES | SHANNAN C. KRASNOKUTSKI, ESQ. |
| New York State Attorney General | Ass't Attorney General |
| Attorneys for Defendants | |
| The Capitol | |
| Albany, NY 12224 | |

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

On July 1, 2020, plaintiff Cynthia Page ("Page" or "plaintiff") filed this official-capacity

42 U.S.C. § 1983 action against defendants New York State Governor Andrew Cuomo

("Governor Cuomo") and New York State Health Commissioner Howard A. Zucker ("Health

Commissioner Zucker") (collectively "defendants") seeking a declaration that Executive Order

205, which imposes a self-quarantine requirement on certain persons traveling to New York

State, violates her constitutional right to travel.

On July 9, 2020, Page moved under Federal Rule of Civil Procedure ("Rule") 65

seeking to preliminarily enjoin defendants' continued enforcement of the challenged

Executive Order.  Defendants, for their part, oppose plaintiff's request for injunctive relief and

have cross-moved under Rule 12(b)(6) to dismiss the complaint in its entirety.

The motions have been fully briefed and oral argument was heard by video on August

6, 2020 from Utica, New York.  Decision was reserved.

## II.  **BACKGROUND**[1]

On June 24, 2020, Governor Cuomo issued Executive Order 205, the latest in a string

of emergency actions taken by New York State in response to the ongoing COVID–19

pandemic.  Compl. ¶¶ 13, 17.  The Executive Order directs Health Commissioner Zucker to

issue a quarantine requirement for certain travelers arriving from out of state:

> All travelers entering New York from a state with a positive test rate
> higher than 10 per 100,000 residents, or higher than a 10% test
> positivity rate, over a seven day rolling average, will be required to
> quarantine for a period of 14 days consistent with Department of
> Health regulations for quarantine.

Ex. 1 to Compl.  The Executive Order makes a violation of this quarantine requirement

enforceable pursuant to the State's public health law.  *Id*.  The Order further provides that

non-compliance may subject the violator to a civil penalty of up to $10,000.  *Id*.

---

[1]  The following facts are taken from Page's complaint and attached exhibits and are assumed true
for the purpose of deciding defendants' motion to dismiss.  The affidavits submitted by defendants will only be
considered (to the extent necessary) for the purpose of determining whether plaintiff should be awarded
preliminary injunctive relief.

Pursuant to Executive Order 205, Health Commissioner Zucker issued "Interim Guidance for Quarantine Restrictions on Travelers Arriving in New York State Following Out of State Travel." Compl. ¶ 19. This State Department of Health ("DOH") document makes use of the virus testing and positivity rate metrics outlined in the Governor's Executive Order to identify a group of states currently experiencing "significant community spread." Ex. 2 to Compl. With a few limited exceptions, the DOH guidance requires any person traveling to New York from one of these so-called "restricted" states to self-quarantine for fourteen days. *Id.* The self-quarantine requirements are onerous:

- The individual must not be in public or otherwise leave the quarters that they have identified as suitable for their quarantine.

- The individual must be situated in separate quarters with a separate bathroom facility for each individual or family group. Access to a sink with soap, water, and paper towels is necessary. Cleaning supplies (e.g. household cleaning wipes, bleach) must be provided in any shared bathroom.

- The individual must have a way to self-quarantine from household members as soon as fever or other symptoms develop, in a separate room(s) with a separate door. Given that an exposed person might become ill while sleeping, the exposed person must sleep in a separate bedroom from household members.

- Food must be delivered to the person's quarters.

- Quarters must have a supply of face masks for individuals to put on if they become symptomatic.

- Garbage must be bagged and left outside for routine pick up. Special handling is not required.

- A system for temperature and symptom monitoring must be implemented to provide assessment in-place for the quarantined persons in their separate quarters.

- • Nearby medical facilities must be notified, if the individual begins to experience more than mild symptoms and may require medical assistance.

- • The quarters must be secure against unauthorized access.

Ex. 2 to Compl.

Page, a U.S. citizen who resides in Arizona, planned to fly to Brooklyn, New York for a couple of weeks to help her friends pack up belongings left in a house they were preparing to sell. Compl. ¶¶ 12, 27. However, just as plaintiff was about to purchase a plane ticket for her two-week trip to New York, Governor Cuomo issued Executive Order 205. *Id*. ¶ 31.

Page does not have COVID–19, and has not been exposed to anyone with symptoms of COVID–19. Page Decl., Dkt. No. 7-4 ¶ 18. However, because Arizona was (and still is) on the list of "restricted states," plaintiff canceled her plans. Compl. ¶¶ 26, 31. Plaintiff alleges that the Executive Order and resulting DOH guidance have made the trip impossible—due to work and family obligations, she is unable to extend her stay to account for the self-quarantine requirement. *Id*. ¶ 32.

Page alleges that this "was and continues to be very upsetting." Compl. ¶ 32. As plaintiff explains, she was "excited to go to New York," and believes this was her "last chance to see the sights of New York City with [her friends]." *Id*. ¶¶ 29-30. To make matters worse, no one else is available to help pack up the home in question and therefore her friend's moving plans are on an indefinite hold. *Id*. ¶¶ 31, 33.

Page alleges the self-quarantine requirement imposed by Executive Order 205 and the DOH guidance is arbitrary, capricious, and irrational. Compl. ¶ 34. In plaintiff's view, the State's restrictions impose "the equivalent of a house arrest" on incoming travelers without requiring any showing that the traveler "actually has COVID–19 or was exposed to someone

who has COVID–19." *Id*. ¶ 22.  According to plaintiff, a perfectly healthy person from a "restricted state" cannot travel to and within New York, but an actively sick person from an unrestricted state can come right in and move about freely.  *Id*. ¶ 34.

## III. **DISCUSSION**[2]

Page's three-count complaint alleges that the self-quarantine requirement imposed by Executive Order 205 violates her right to travel freely between states, a fundamental liberty interest protected by the Equal Protection Clause (Count One), the citizenship clauses of the Fourteenth Amendment and Article IV (Count Two), and the Due Process Clause (Count Three).

In Page's view, the COVID–19 pandemic does not justify a departure from, or modification to, the constitutional analysis that applies to state action that burdens or restricts a fundamental constitutional right.  Pl.'s Mem., Dkt. No. 7-3 at 7-9.[3]  Although plaintiff acknowledges that defendants might have "a compelling interest in preventing the spread of COVID–19," she maintains that the "challenged restriction is not narrowly tailored to achieve that interest." *Id*. at 18.

As Page explains, Executive Order 205 forces a perfectly healthy person who flies in from Arizona (or any other "restricted" state) to face a fourteen-day quarantine but would permit even an actively sick person from New Jersey (or any other "unrestricted" state) to travel freely within and around the State.  Pl.'s Mem. at 18-19.  According to plaintiff, the

---

[2]  Although Eleventh Amendment immunity can sometimes pose a bar to § 1983 relief against state officials, the doctrine of *Ex parte Young* permits an official-capacity claim for prospective injunctive relief to remedy an ongoing violation of federal constitutional law like the one alleged in this case.  *See, e.g., Avitabile v. Beach*, 277 F. Supp. 3d 326, 332 (N.D.N.Y. 2017).

[3]  Pagination corresponds to CM/ECF.

travel restriction "is so woefully underinclusive as to render belief in [its stated] purpose a challenge to the credulous." *Id*. at 19 (quoting *Republican Party v. White*, 536 U.S. 765, 780 (2002)).

Defendants respond that the Executive Order is constitutional "under the deferential standard that applies to governmental measures designed to address an ongoing public health emergency." Defs.' Opp'n, Dkt. No. 11-31 at 7-8. In defendants' view, governing Supreme Court precedent "expressly recognizes the inapplicability of strict scrutiny when reviewing government action taken in response to an emergency, such as a worldwide pandemic." *Id*. at 12.

As defendants explain, in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the Supreme Court set out a "separate standard for evaluating constitutional challenges to state action designed to combat an epidemic" that is "far more deferential to the state than the principles that would control in ordinary times." Def.'s Opp'n at 12. Instead of the compelling interest and narrow tailoring burdens that are ordinarily imposed on a state by the strict scrutiny analysis, *Jacobson* asks whether the challenged measure bears some "real or substantial relation" to protecting public health, and examines whether the measure is "beyond all question, a plain, palpable invasion" of fundamental constitutional rights. *Id*. at 12-13 (quoting *Jacobson*, 197 U.S. at 31).

In reply, Page rejects the notion that *Jacobson* "creates a different constitutional standard of review." Pl.'s Reply, Dkt. No. 15 at 9-10. Plaintiff emphasizes that, contrary to defendants' assertion, "circuit and district courts across the country are not of one mind on the application of *Jacobson*." *Id*. at 11. According to plaintiff, even under *Jacobson* the reviewing court must "address the question whether the quarantine order is a plain and

palpable invasion of the fundamental law." *Id*. at 12.  Plaintiff asserts that this language from

*Jacobson* is a clear indication that courts must continue to apply traditional means–ends

scrutiny to measures that burden fundamental rights, even in times of crisis.  *Id*. at 14-15.

## A. Preliminary Injunction

The right to travel is not explicitly mentioned in the text of the Constitution.  *Saenz v.*

*Roe*, 526 U.S. 489, 498 (1999).  But it is undoubtedly fundamental.  *See, e.g.*, *United States*

*v. Guest*, 383 U.S. 745, 758 (1966) ("Freedom to travel throughout the United States has

long been recognized as a basic right under the Constitution.").  As Justice Stewart explained

in *Guest*, this omission almost certainly resulted from a simple fact:  the drafters thought of it

as such a basic and fundamental right that it did not need to be reduced to writing.  *Id*.

The absence of a specific textual source for the right to travel has given rise to a

long-running debate between the justices.  It has been called an incident of national

citizenship.  *Guest*, 383 U.S. at 763-64 (Harlan, J., concurring in part and dissenting in

part) (Privileges and Immunities Clause of Article IV); *Edwards v. California*, 314 U.S. 160,

177-78 (1941) (Douglas, J., concurring) (Privileges or Immunities Clause of the Fourteenth

Amendment).[4]  It has been described as a liberty interest protected by Due Process.  *Jones*

*v. Helms*, 452 U.S. 412, 418 (1981).  And sometimes, it has been characterized as an Equal

Protection claim.  *Zobel v. Williams*, 457 U.S. 55, 60 n.6 (1982) ("Right to travel cases have

examined, in equal protection terms, state distinctions between newcomers and longer term

---

[4]  In *Edwards*, the majority invalidated on Commerce Clause grounds a California law that made it a
misdemeanor offense to knowingly assist an indigent person in entering the State.  314 U.S. at 171.  Justice
Douglas, joined by Justices Black and Murphy, wrote separately to explain his belief that state action
burdening the right to travel violated the Privileges or Immunities Clause of the Fourteenth Amendment.  *Id*. at
181.  Justice Jackson, on the other hand, thought the right belonged to the Privileges and Immunities Clause
of Article IV.  *Id*. at 182.

residents.").

"Whatever its source, a State may neither tax nor penalize a citizen for exercising his right to leave one State and enter another." *Jones*, 452 U.S. at 419. And as the Second Circuit has since acknowledged, this right to travel between the states includes a "correlative constitutional right to travel within a state." *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 649 (2d Cir. 1971).

In its modern formulation, the right to travel embraces at least three distinct components: (1) "the right of a citizen of one State to enter and to leave another State"; (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State"; and (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz*, 526 U.S. at 500.

However, the fundamental nature of the right to travel is not itself sufficient to warrant relief, since a preliminary injunction is "an extraordinary remedy never awarded as of right." *Avitabile v. Beach*, 277 F. Supp. 3d 326, 332 (N.D.N.Y. 2017) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)); *see also Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) ("A preliminary injunction is an equitable remedy and an act of discretion by the court.").

Rather, a party seeking preliminary relief must show: "(1) a likelihood of irreparable harm; (2) either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in their favor; (3) that the balance of hardships tips in their favor regardless of the likelihood of success; and (4) that an injunction is in the public interest." *Avitabile*, 277 F. Supp. 3d at 332 (quoting *Williams v. Conway*, 236

F. Supp. 3d 554, 581 (N.D.N.Y. 2017)).

Importantly, though, the nature of the relief sought by Page necessitates a slightly more rigorous application of this preliminary injunction standard. Pl.'s Mem. at 14; Def.'s Opp'n at 11. As both parties acknowledge, the Second Circuit has held a movant seeking injunctive relief to a heightened standard where the injunction: (1) is "mandatory," that is, it would alter the status quo; or (2) "will provide the movant with substantially all of the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *N.Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995)). "When either condition is met, the movant must show a 'clear' or 'substantial' likelihood of success on the merits, and make a 'strong showing' of irreparable harm." *Id*.

The parties' agreement on this threshold issue is noteworthy because it actually runs counter to the approach taken by another court called on to resolve a virtually identical constitutional challenge to Executive Order 205. In *Corbett v. Cuomo*, U.S. District Judge Lorna Schofield of the Southern District of New York declined to apply the more demanding standard to the plaintiff's request for preliminary relief from the quarantine requirement, reasoning that the remedy sought by plaintiff would only "prohibit[ ], rather than compel[ ], government action." Ex. B to Krasnokutski Decl., Dkt. No. 11-3 at 22.

As *Corbett* noted, courts have rightly criticized this attempt at binary classification, since the distinction between "mandatory" and "prohibitory" injunctive relief usually proves to be more semantic than substantive. *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 90 (2d Cir. 2006). However, *Corbett* did not consider the other reason given for raising the bar to injunctive relief; *i.e.*, whether it would "provide the movant with substantially all of the relief

sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." This latter justification applies to this case, since exempting Page (or others) from the self-quarantine requirement imposed by the Executive Order is not the kind of equitable relief than can be unwound later on in the litigation.

Page's request for injunctive relief fails under either version of this standard. Plaintiff has not shown irreparable harm, "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation and internal quotation marks omitted). "To satisfy the irreparable harm requirement, [the plaintiff] must demonstrate that absent a preliminary injunction [she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.*; *see also Donohue v. Mangano*, 886 F. Supp. 2d 126, 149-50 (E.D.N.Y. 2012) ("The concept of irreparable harm has been described 'as certain and imminent harm for which a monetary award does not adequately compensate.'" (quoting *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113-14 (2d Cir. 2003)).

Page alleges the fourteen-day quarantine requirement has deprived her of the chance to go sightseeing with her friend in New York City, which "was and continues to be very upsetting." Compl. ¶¶ 31-33. And because there is no one else available to help with the move, her friends have been forced to place their plans to pack up the old house in Brooklyn on hold. *Id.* ¶ 33. These allegations are hardly cognizable as harm, let alone irreparable harm sufficient to justify preliminary relief. *Cf. Lee v. Trump*, 2020 WL 1330673, at *1 (S.D.N.Y. Mar. 23, 2020) (rejecting claim of irreparable harm from federal travel restriction imposed at the outset of the COVID–19 pandemic where pro se plaintiff's family members

were forced to delay their visit from abroad).

Page's other assertion of irreparable harm is based on her allegation that the Executive Order infringes her fundamental right to travel. According to plaintiff, the irreparable harm element is necessarily satisfied as a matter of law where, as here, the complaint alleges the violation of a constitutional right. Pl.'s Mem. at 19-20. Defendants, for their part, contend that this presumption of harm only arises in "cases involving First Amendment and related rights." Def.'s Opp'n at 26.

Page's argument is halfway correct. As defendants point out, this presumption of harm seems to arise most frequently in the context of First Amendment litigation. *See, e.g.*, *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). But the Second Circuit has also applied the presumption in other contexts, such as in an Eighth Amendment claim brought by a prisoner challenging the constitutionality of the conditions of his confinement. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

As the Second Circuit explained in *Jolly*, the favorable presumption of irreparable harm arises only *after* a plaintiff has shown a likelihood of success on the merits of the constitutional claim. 76 F.3d at 482 ("[W]e agree with the district court that the plaintiff has shown a substantial likelihood of success on his Eighth Amendment claim. The district court therefore properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights."). Thus, when a plaintiff seeks injunctive relief based on an alleged constitutional deprivation, "the two prongs of the preliminary injunction threshold merge into one . . . in order to show irreparable injury, plaintiff must show a likelihood of success on the merits." *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000).

This blended inquiry gets to the core of the parties' dispute: how does the Supreme

Court's 115-year-old opinion in *Jacobson v. Massachusetts* impact the constitutional analysis otherwise applicable to state action alleged to burden a fundamental right? According to Page, the Supreme Court has spent the decades since *Jacobson* refining and adopting a much more demanding approach to this question in the form of a means–ends test known as strict scrutiny. Defendants, on the other hand, contend that *Jacobson*'s much more forgiving standard applies to all constitutional questions that arise during a public health emergency.

*Jacobson* is old law. The facts arose in the midst of a 1902 outbreak of smallpox in the city of Cambridge. *Jacobson*, 197 U.S. at 12-13. Municipal health officials, acting pursuant to a Massachusetts state law that empowered them to mandate vaccinations if deemed necessary "for the public health or safety," had ordered all citizens to be vaccinated to curb the spread of the disease. *Id*. at 12. Henning Jacobson refused, insisting he had a Fourteenth Amendment right "to care for his own body and health in such a way as to him seems best." *Id*. at 26. The State fined him $5 for the trouble. *Id*. at 21.

Mr. Jacobson's constitutional challenge to the validity of the State's compulsory vaccination law eventually made its way to the Supreme Court, which rejected a claim that today we would recognize as a substantive due process challenge. *Jacobson*, 197 U.S. at 12. In *Jacobson*, the Court reasoned that the Constitution's guarantee of individual liberty "does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id*. at 26.

*Jacobson* held that it was within the State's police power to impose a mandatory vaccination regime in an effort to protect the community "against an epidemic of disease which threatens the safety of its members." 197 U.S. at 26. In finding the plaintiff's personal liberty interest outweighed by the State's interest in protecting the public as a whole, the

Court cautioned that judicial scrutiny of emergency public health measures should be reserved for those actions that bear "no real or substantial relation to" the object of protecting "the public health, the public morals, or the public safety," or that are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." 197 U.S. at 31.

Page contends that this deferential test has since been supplanted, at least in part, by modern constitutional analysis. According to plaintiff, the "plain, palpable invasion of rights" language from *Jacobson* is best understood as an instruction to courts to refer to the "extant body of constitutional law" to evaluate state action that burdens a fundamental right. In other words, plaintiff contends that defendants must still satisfy strict scrutiny.

Of course, *Jacobson* does not speak in terms of "means" and "ends," the stock-in-trade of modern constitutional analysis when restrictions are alleged to burden certain constitutional rights. But that is to be expected, since the Supreme Court did not even begin the project of building out tiers of judicial scrutiny until thirty years later. *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938).

Page is correct that today, state action that burdens a fundamental right or liberty interest is ordinarily subject to strict scrutiny, which has been called "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Under that test, the challenged action "must be narrowly tailored to promote a compelling Government interest," and "must use the least restrictive means to achieve its ends." *Evergreen Ass'n, Inc. v. City of N.Y.*, 740 F.3d 233, 246 (2d Cir. 2014) (citation omitted).

Page is also correct that the Supreme Court has recently applied strict scrutiny to state action that burdened the fundamental right to travel. In *Saenz v. Roe*, the Supreme Court invalidated a state law limiting certain welfare benefits for citizens who failed to meet a

twelve-month durational residency requirement. 526 U.S. at 498, 511.

Finally, Page rightly points out that *Jacobson* has its detractors. The most relevant to this discussion might be *Bayley's Campground Inc. v. Mills*, a case in which a federal trial court in Maine refused to apply *Jacobson*'s deferential framework to an executive order requiring all persons entering the State to self-quarantine as a means of slowing the spread of coronavirus. 2020 WL 2791797, at *9 (D. Me. May 29, 2020), *reconsideration denied*, 2020 WL 3037252 (D. Me. June 5, 2020).

Although *Mills* ultimately denied preliminary injunctive relief from the quarantine requirement on other grounds, the court criticized *Jacobson* at length, characterizing it as "a legal standard that is at least the opposite of strict judicial scrutiny" that amounts to "a rubber stamp for all but the most absurd and egregious restrictions on constitutional liberties." 2020 WL 2791797, at *7-8.

This view has other supporters. *See, e.g.*, *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 942 (9th Cir. 2020) (Collins, J., dissenting) ("Nothing in *Jacobson* supports the view that an emergency displaces normal constitutional standards."). But a review of the current landscape confirms that they are solidly in the minority. Courts faced with constitutional challenges to quarantine orders have continued to rely on *Jacobson*, even before the current coronavirus pandemic. *See, e.g.*, *Hickox v. Christie*, 205 F. Supp. 3d 579, 591 (D.N.J. 2016) (evaluating constitutional challenge to federal quarantine order asserted by a plaintiff returning to U.S. after treating Ebola patients abroad).

As relevant here, courts across the country have nearly uniformly relied on *Jacobson*'s framework to analyze emergency public health measures put in place to curb the spread of coronavirus. *See, e.g.*, *In re Abbott*, 954 F.3d 772, 785 (5th Cir. 2020) (faulting district court

for "ignor[ing] the framework governing emergency public health measures" set forth in *Jacobson*); *In re Rutledge*, 956 F.3d 1018, 1028 (8th Cir. 2020) ("[T]he district court's failure to apply the *Jacobson* framework produced a patently erroneous result."); *Carmichael v. Ige*, 2020 WL 3630738, at *5 n.6 (D. Haw. July 2, 2020) (rejecting assertion that *Jacobson* is inapplicable to plaintiffs' challenge to quarantine requirement); *Ass'n of Jewish Camp Operators v. Cuomo*, –F. Supp. 3d–, 2020 WL 3766496, at *8 (N.D.N.Y. July 6, 2020) (Suddaby, J.) ("[T]he Court joins the many courts throughout the country that rely on *Jacobson* when determining if a governor's executive order has improperly curtailed an individual's constitutional right during the COVID–19 pandemic."); *McCarthy v. Cuomo*, 2020 WL 3286530, at *3 (E.D.N.Y. June 18, 2020) (applying *Jacobson* to reject challenge to several State Executive Orders related to the pandemic); *Geller v. De Blasio*, –F. Supp. 3d –, 2020 WL 2520711, at *3 (S.D.N.Y. May 18, 2020) (applying intermediate scrutiny "through th[e] lens" of *Jacobson* to reject a First Amendment challenge to New York City's order restriction non-essential gatherings).

And while it does not come in the form of binding precedent, no less an authority than the Chief Justice of the Supreme Court has thrown his support behind the continued vitality of *Jacobson*'s deferential framework in the midst of this unfolding public health crisis. *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613-14 (mem.) (Roberts, C.J., concurring) (opining that politically accountable officials are deserving of especially broad latitude in areas of medical and scientific uncertainty).

Thus, while *Jacobson* "has been thoughtfully criticized by legal scholars for lacking in limiting principles characteristic of legal standards," *Mills*, 2020 WL 2791797, at *8, the case "remains alive and well - including during the present pandemic." *Altman v. Cty. of Santa*

*Clara*, –F. Supp. 3d–, 2020 WL 2850291, at *7 (N.D. Cal. June 2, 2020) (rejecting assertion that *Jacobson* was merely "arcane constitutional jurisprudence" in challenge to municipal shelter-in-place order issued during the pandemic).

Under *Jacobson*, "[t]he bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" *In re Abbott*, 954 F.3d at 784 (quoting *Jacobson*, 197 U.S. at 31).

Measured against this deferential standard, Page has no chance of success on the merits of any of her claims. Defendants' submissions establish that COVID–19 "is a highly infectious and potentially deadly respiratory disease caused by a newly discovered coronavirus that spreads easily from person-to-person." Hutton Decl., Dkt. No. 11-5 ¶ 5. These submissions also establish that the virus that causes COVID–19 "has an incubation period of up to fourteen days." *Id*. ¶ 21.

As defendants explain, "[f]ourteen days was selected as the quarantine period because fourteen days is understood to be the average incubation period for the COVID–19 virus . . . . If a person is not exhibit any symptoms fourteen days after entering the state, it is unlikely that he or she was infected with the virus at the time of entry. Hutton Decl. ¶ 36. Plaintiff has made no contrary showing. Accordingly, plaintiff has not demonstrated that the Executive Order bears "no real or substantial relation" to public health.

Nor is the self-quarantine requirement a "plain, palpable invasion" of Page's fundamental right to travel. Far from it. Under the plain terms of the Executive Order, individuals from restricted states remain free to enter New York. They must comply with the

quarantine requirement after they arrive, but that requirement is equally applicable to a New York resident who has arrived from a restricted state.  And whether resident or non-resident, any traveler who completes the quarantine remains completely free to travel freely within the State itself.  Accordingly, plaintiff has not demonstrated[5] that the Executive Order is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."

These conclusions would be the same even if the Court approached Page's challenge to the Executive Order the same way that Judge Schofield did in *Corbett*.  There, the court concluded that the State's self-quarantine requirement burdened the plaintiff's right to travel because it "deters individuals from entering the state."  *Corbett* at 25 (referring generally to the Supreme Court's decision in *Saenz*).

Even so, *Corbett* reasoned that, "in these extraordinary circumstances," the "general principles" set forth in *Jacobson* must still "inform" the strict scrutiny analysis.  *Corbett* at 25-26.  Applying that formulation, Judge Schofield found that New York had a compelling interest in combating the spread of the virus, that the State had demonstrated the quarantine measure was the least burdensome way to serve that interest, and that less restrictive means were considered but found to not be viable.  *Id*. at 26.  Defendants have made the same showing in this case.  Hutton Decl. ¶¶ 40, 44-45.

Finally, the parties' briefing and presentation at oral argument raise two additional points that warrant brief discussion.  First, Page has criticized defendants' characterization of the quarantine requirement as an essential component of New York's ongoing coronavirus

---

[5]  At oral argument, there was a good deal of cross-talk about burdens.  Plaintiff, as the party seeking a preliminary injunction, bears the burden of demonstrating an entitlement to that relief.  Defendant, as the party defending state action subject to strict scrutiny (if it applied, which it does not under these circumstances) would bear the ultimate burden of demonstrating its constitutionality at summary judgment or trial.

response.  In plaintiff's view, the State's claim of necessity is totally undermined by the fact that defendants have already managed to "flatten the curve" without restricting interstate travel.  According to plaintiff, if cases do begin to rise defendants should just re-impose "the same restrictions that [they] did earlier to halt the pandemic and to flatten the curve without the 14-day quarantine."  Tr. at 7:10-13.

The problem for Page is that neither *Jacobson* nor *Corbett* (nor the law of strict scrutiny, for that matter) requires policymakers to enact inflexible, unchanging measures that fail to account for the facts on the ground.  If anything, just the opposite is true.  Under any standard of review, public health officials can and should continue calibrating their responsive measures to the situation as it unfolds.

Defendants' submissions establish that the State's early response aimed to slow a threat from within:  the *intrastate* spread of coronavirus, which had broken out in the downstate area and in other regional hubs of activity.  Hutton Decl. ¶¶ 9-10, 24, 26.  As New York made progress on that front, other states around the country began to report a significant uptick in positive test rates.  *Id*. ¶ 32.  Thus, when the State began to roll back some of its internal restrictions, it sought ways to slow a new threat from without:  the *interstate* spread of coronavirus, which in the ensuing months had become mathematically more likely to be carried in from states with high rates of positive tests.  *Id*. ¶¶ 32-40.

Second, the Court declines to apply Page's proposed formulation of the interaction between *Jacobson* and more modern constitutional analysis.  In her view, a plaintiff who alleges the deprivation of a fundamental right has necessarily satisfied the "plain, palpable invasion" language of *Jacobson*, which opens the door to the same means–end scrutiny of challenged state action that would ordinarily occur in the absence of a public health crisis.

- 18 -

But this circular exercise is just a roundabout way of saying that *Jacobson* should be held inapplicable to certain constitutional rights. Whether you called it strict scrutiny or something else, this approach would preserve a subset of rights that could hardly ever be lawfully curtailed, even for limited durations and even in response to a public health emergency. Yet it is the temporary infringement of those core rights that generates the greatest impact on public health during an outbreak of disease. *See, e.g.*, *Jacobson*, 197 U.S. at 12-13 (objecting to compulsory vaccination against smallpox); *Geller*, 2020 WL 2520711, at *1 (objecting to emergency order restricting non-essential gatherings during coronavirus pandemic).

That is why nearly every court to consider these issues has chosen to rely on *Jacobson*'s community-oriented framework. *See, e.g.*, *In re Abbott*, 954 F.3d at 786 ("*Jacobson* instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency."); *Best Supplement Guide, LLC v. Newsom*, 2020 WL 2615022, at *4 (E.D. Cal. May 22, 2020) ("Although courts have not yet defined the precise contours of this [plain, palpable invasion] standard, it plainly puts a thumb on the scale in favor of upholding state and local officials' emergency public health responses.").

This is not to say that *Jacobson* grants the State *carte blanche* to run roughshod over the Constitution. "As other judges have emphasized, *Jacobson* preserves the authority of the judiciary to strike down laws that use public health emergencies as a pretext for infringing individual liberties." *Cassell v. Snyders*, –F. Supp. 3d–, 2020 WL 2112374, at *7 (N.D. Ill. May, 3, 2020). And no matter what, "*Jacobson*'s reach ends when the epidemic ceases." *Id*.

In sum, Page cannot show any likelihood of success on the merits of her claims and therefore she is not entitled to the presumption of irreparable harm that attaches to the

alleged deprivation of a constitutional right. *Jolly*, 76 F.3d at 482. Beyond that, the injunctive relief sought by plaintiff would also upset a major component of the State's current public health response to COVID–19. *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that the "balance of equities" and "public interest" components of the preliminary injunction analysis merge when government is the party opposing relief). Accordingly, plaintiff's motion for a preliminary injunction will be denied.

## B. Motion to Dismiss

Defendants have cross-moved to dismiss Page's complaint in its entirety. In their view, plaintiff's claims fail regardless of whether they are analyzed under *Jacobson* or the more traditional framework for evaluating right to travel claims. Def.'s Opp'n at 18. Plaintiff responds that defendants' motion "is little more than yelling 'Pandemic!' in a crowded theatre and waiting for the judges in the audience to flee for the exits." Pl.'s Reply at 19. According to plaintiff, the complaint plainly alleges that the Executive Order "places an onerous burden on interstate travel that does not satisfy strict scrutiny." *Id*. at 20.

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Forjone v. Dep't of Motor Vehicles*, 414 F. Supp. 3d 292, 298 (N.D.N.Y. 2019) (quoting *Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012)). "Dismissal is appropriate only where plaintiff has failed to provide some basis for the allegations that support the elements of his claims." *Id*.

"When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor." *United States v. Bedi*, 318 F. Supp. 3d 561, 564-65 (N.D.N.Y. 2018) (citation omitted). "In making this determination, a court generally confines itself to the facts

stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." *Forjone*, 414 F. Supp. 3d at 298 (citation and internal quotation marks omitted).

## A. Equal Protection & the Citizenship Clauses

Page's complaint alleges that Executive Order 205 violates the Equal Protection Clause of the Fourteenth Amendment and both citizenship clauses (found in the Fourteenth Amendment and in Article IV) because it "imposes a penalty on the right to travel," Compl. ¶¶ 41-49, and violates her "fundamental right to freely travel interstate," Compl. ¶ 55.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)); *see also Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 213 (3d Cir. 2013) (analyzing Privileges or Immunities Clause claim under Equal Protection standard); *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 102 (2d Cir. 2009) (analyzing Privileges and Immunities Clause claim under *Saenz*).

Contrary to Page's assertion, it is far from clear that Executive Order 205 burdens one or more of the three components of the right to travel identified by the Supreme Court in *Saenz*. The Court recognizes that *Corbett* held otherwise. But it is worth emphasizing that the Executive Order is, for example, unlike the quarantine requirement challenged in *Mills*, which effectively closed the borders of Maine "to any out-of-stater who does not own or rent property" by directing hotels, motels, and even campgrounds to turn away all travelers who had not already completed their quarantine within the state. *Mills*, 2020 WL 2791797, at *10.

Executive Order 205 is different.  Under the plain terms of the Order, individuals from restricted states remain free to enter New York.  They must comply with the quarantine requirement after they arrive, but that requirement is equally applicable to a New York resident who has arrived from a restricted state.  And whether resident or non-resident, any traveler who completes the quarantine remains completely free to travel freely within the State itself.  In other words, the State is not drawing a distinction between residents and non-residents but between individuals with and without a mathematically heightened risk of spreading COVID–19.  *See Carmichael*, 2020 WL 3630738, at *7.

Besides, "not everything that deters travel burdens the fundamental right to travel." *Matsuo v. United states*, 586 F.3d 1180, 1183 (9th Cir. 2009); *see also Selevan*, 584 F.3d at 101 & n.9 (suggesting that minor restrictions on the right to travel do not always amount to a "penalty").  And if you begin from this baseline assumption, all of the cases on which Page relies to justify the application of heightened scrutiny begin to look like a poor fit for evaluating a fourteen-day quarantine requirement that is equally applicable to residents and non-residents alike.

For instance, *Guest* is a criminal appeal from the denial of a motion to dismiss an indictment alleging a conspiracy to deprive citizens of the right to travel.  383 U.S. at 747 & n.1.  There, a group of defendants were accused of, *inter alia*, shooting and killing an African–American man traveling in a car with a group of his friends.  *Id*.  *Dunn* invalidated a one-year residency requirement for voting in a Tennessee election.  405 U.S. at 334.  *Jones* entertained a challenge to a Georgia law that elevated the misdemeanor crime of child abandonment to a felony if the parent fled the State.  452 U.S. at 415 & n.7.  And *Saenz* involved a twelve-month waiting period imposed by California on newly arrived residents in

an effort to save money. 526 U.S. 492-94.

The facts of these cases are all markedly different, and draw different markedly classifications, than the fourteen-day quarantine imposed on travelers by the Executive Order. In any event, plaintiff has failed to state a plausible claim for relief under the deferential framework of *Jacobson*. Accordingly, these claims will be dismissed.

## B. Due Process

Page's complaint also alleges that Executive Order 205 violates the Due Process Clause of the Fourteenth Amendment because it "compels persons . . . to quarantine without requiring the government to demonstrate that the person has COVID–19 or was actually exposed to COVID–19." Compl. ¶ 63.

The Due Process Clause protects procedural and substantive rights. "Procedural due process requires that 'a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Ceja v. Vacca*, 503 F. App'x 20, 22 (2d Cir. 2012) (summary order) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)).

"Procedural due process rules are meant to protect persons . . . from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). "Substantive due process protects against government action that is arbitrary, conscience shocking, or oppressive in a constitutional sense, but not against a government action that is incorrect or ill-advised." *Kisembo v. N.Y. State Office of Children & Family Servs.*, 285 F. Supp. 3d 509, 521 (N.D.N.Y. 2018) (citation omitted).

There is nothing conscience-shocking about the Executive Order. As the foregoing discussion should have made clear, states around the country are grappling with an

unfolding public health crisis.  The principal constitutional guidance on what amounts to a permissible response to this crisis is over one hundred years old.  At best, Page has alleged state action that might be considered "incorrect or ill-advised."  Accordingly, plaintiff has failed to state a substantive due process claim.

Page has also failed to plead a procedural due process claim.  The constitutional safeguard of due process is not some "technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Rest. Workers v. Mcelroy*, 367 U.S. 886, 895 (1961) (cleaned up).  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  For instance, summary administrative action may be justified "where, as here, it responds to situations in which swift action is necessary to protect the public health and safety." *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 299-300 (1981).

Even assuming the Executive Order infringed her liberty interest in the right to travel, the COVID–19 pandemic is precisely the "scenario for which emergency action would be expected." *Mills*, 2020 WL 2791797, at *12.  And although the Second Circuit has warned that summary action should generally be followed by a "prompt post-deprivation hearing," Page has not alleged that she has been denied access to an adequate remedy under State law.  *Cf. DiBlasio v. Novello*, 413 F. App'x 352, 357 (2d Cir. 2011) (summary order).  Accordingly, these claims will also be dismissed.

## IV. <u>CONCLUSION</u>

*Jacobson* was decided just after the turn of the last century, at a time when medical science was in its adolescence if not still in its infancy.  Because it endorses an approach to constitutional analysis that has fallen out of fashion, it is admittedly strange—and even a little

alarming—to discover that *Jacobson* is still considered the right tool for evaluating state action taken to protect public health.  Yet unless and until the Supreme Court revisits *Jacobson* and fashions a test that demands a more particularized showing from public health officials in light of the unbelievable medical achievements of the twenty-first century, it remains a complete roadblock to Page's claims.

Therefore, it is

ORDERED that

1.  Page's motion for a preliminary injunction is DENIED;

2.  Defendants' motion to dismiss is GRANTED; and

3.  Page's complaint is DISMISSED.

The Clerk of the Court is directed to terminate the pending motions, enter a judgment accordingly, and close the file.

IT IS SO ORDERED.


Dated:  August 11, 2020
         Utica, New York.

                                                                    United States District Judge